**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| LEIF'S AUTO COLLISION CENTERS, LLC, | **DISPOSITIVE MOTION** |
| Plaintiff, | MDL Docket No. 2557 |
| v. | Case No. 6:18-cv-06025 |
| GOVERNMENT EMPLOYEES INSURANCE COMPANY, | Originally filed in the District of Oregon |
| Defendants. | |

**GOVERNMENT EMPLOYEES INSURANCE COMPANY'S MOTION AND**
**SUPPORTING MEMORANDUM TO DISMISS THE COMPLAINT**

Defendant Government Employees Insurance Company ("GEICO") moves to dismiss Plaintiff's Complaint and Demand for Jury Trial ("Complaint") for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). The grounds and authority for this motion are in the following supporting memorandum.

**Memorandum of Law**

Plaintiff Leif's Auto Collision Centers, LLC ("Leif's") alleges it cannot perform auto collision repair services as efficiently and cost-effectively as body shops with which GEICO allegedly partners, shops Leif's calls Auto Repair Xpress partners ("ARX shops"). *See, e.g.*, Doc. 1, Compl. ¶ 29. The ARX shops allegedly agree to certain concessions on price, signage in their shops, and periodic inspections of their books and records for these referrals.[1]  *Id.* at ¶¶ 8-10.

---

[1] Although GEICO must treat the allegations in the Complaint as true for this Motion, GEICO disagrees with many of the allegations, and several allegations about ARX shops – including allegations of price and other agreements with ARX shops – are manifestly false. *See Peterson v. Atlanta Housing Authority*, 998 F.2d 904, 912 (11th Cir. 1993) (allegations assumed to be true for a Rule 12(b)(6) motion). GEICO analyzes and negotiates each claim on a claim-by-claim, vehicle-by-vehicle basis, reaching a separate understanding with each insured or claimant on what must

-1-

According to Leif's allegations, GEICO refuses to pay Leif's more for repairs than it pays ARX shops, and tells its policyholders they will receive superior service from an ARX shop. *Id.* at ¶¶ 13, 34. Leif's did not allege GEICO has refused to do business with Leif's, just that GEICO refuses to pay Leif's more than GEICO pays ARX shops. *Id.* at ¶¶ 13, 34. Leif's also does not allege that ARX shops ever communicate with each other, or allege any facts plausibly suggesting they would have any reason to conspire with each other; instead, Leif's merely alleges that each ARX shop has a vertical agreement with GEICO.

Leif's asserts three claims against GEICO for violations of Section 1 of the Sherman Act, – *per se* price fixing, *per se* group boycott, and rule of reason group boycott – and a state law claim for intentional interference with economic relations. Each claim fails and should be dismissed.

The *per se* price fixing and boycott claims fail because Leif's alleges only vertical agreements between GEICO and the ARX shops. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 907 (2007) (vertical agreements are subject to rule of reason, not the *per se* standard). Both boycott claims fail because Leif's alleges no plausible facts tending to show GEICO agreed to boycott Leif's or refused to deal with Leif's. The rule of reason boycott claim also fails because Leif's did not allege the elements of a rule of reason claim, including a relevant product market, a relevant geographic market, that GEICO possesses market power, that anticompetitive effects outweigh procompetitive benefits, or that there are barriers to entry.

Even had Leif's alleged facts establishing the substantive elements of its antitrust claims, these claims fail because Leif's alleges no facts demonstrating antitrust injury to support standing under the Sherman Act. The harm Leif's alleges – losing customers to lower-priced competitors

---

be done and at what cost, per the terms of each individual policy. GEICO has no agreement with any shop that determines the price of any repair before the damaged vehicle is brought to the shop.

– is not the type of harm the antitrust laws are meant to correct.[2]

Finally, Leif's intentional interference claim fails because Leif's alleges no facts tending to prove the elements of its claim. The Complaint should be dismissed with prejudice because Leif's cannot state a claim for violation of the Sherman Act or Oregon law.

## I.   THE PRICE FIXING CLAIM (CLAIM ONE) FAILS BECAUSE LEIF'S ALLEGES NO HORIZONTAL AGREEMENTS TO FIX PRICES

Section 1 of the Sherman Act "outlaw[s] only unreasonable restraints." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). The rule of reason is presumed to apply, unless Leif's allegations show the *per se* test applies. *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006); *Cha-Car, Inc. v. Calder Race Course, Inc.*, 752 F.2d 609, 612-13 (11th Cir. 1985). Leif's does not allege GEICO agreed with any **competitor**, conclusorily asserting a hub-and-spoke conspiracy between GEICO and ARX shops instead. Compl. ¶ 19. A "hub-and-spoke" conspiracy requires: "(1) a hub, such as a dominant purchaser; (2) spokes, such as competing manufacturers or distributors that enter into vertical agreements with the hub; and (3) the rim of the wheel, which consists of horizontal agreements among the spokes." *In re: Disposable Contact Lens Antitrust*, 215 F.Supp.3d 1272, 1298 (M.D. Fla June 14, 2016) (citing *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015)). Leif's attempt to allege a hub-and-spoke conspiracy fails because Leif's alleges no rim, and therefore, no plausible allegation of price-fixing among the spokes, the ARX shops.

---

[2] The Court will likely lack subject matter jurisdiction over the antitrust claims under the McCarran-Ferguson Act, once the Court explores past the confines of the Complaint. Paying for claims and recommending repair shops are the "business of insurance." *See U. S. Dept. of Treasury v. Fabe*, 508 U.S. 491, 503 (1993) ("There can be no doubt that the actual performance of an insurance contract falls within the 'business of insurance' . . . .") (citing *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 134 n.8 (1982) and *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205 (1979)). How an insurer recommends a body shop is regulated by the State of Oregon. *See, e.g.*, Or. Rev. Stat. § 746.280 (case modified) (discussing an insured's rights when an insurer recommends a repair shop).

Leif's alleges no facts plausibly suggesting any horizontal agreements between the ARX shops.  Compl. ¶¶ 19, 28, 29.  Leif's offers no direct allegations of agreements between ARX shops, so Leif's must allege parallel conduct with "plus factors" to "nudge" the allegations of horizontal agreements between ARX shops "across the line from conceivable to plausible."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *In re Musical Instruments*, 798 F.3d at 1193.

Leif's fails to allege plus factors relating to the ARX shops conduct; it only alleges ARX shops engage in equally-plausible – frankly, more-plausible – unilateral conduct.  "Whereas parallel conduct is as consistent with independent action as with conspiracy, plus factors are economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *In re: Disposable Contact Lens,* 215 F.Supp.3d at 1294-95 (citations omitted); *see also, e.g., Quality Auto Painting Ctr. of Roselle, Inc., v. State Farm Indem. Co.*, 917 F.3d 1249, 1263-71 (11th Cir. 2019).[3]

Leif's does not allege any sudden, unprecedented but uniform pricing or practices change by the ARX shops.  *See Quality Auto Painting*, 917 F.3d at 1265-66 ("auto body repairs are not the type of 'made-to-order product . . . ' where we expect to see divergent pricing" and "without an expectation of divergent pricing, all that remains is an allegation of uniform pricing, which is indicative only of parallel conduct").  Rather, it alleges ARX shops have been engaging in the same conduct for at least six years.  Compl. ¶ 6.  Leif's also does not allege a single incident or set

---

[3] *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 935 (7th Cir. 2000) ("The TRU case…presents a more compelling case for inferring horizontal agreement…because not only was the manufacturers' decision to stop dealing with the warehouse clubs an abrupt shift from the past, and not only is it suspicious for a manufacturer to deprive itself of a profitable sales outlet, but the record here include the direct evidence of communications…"); *U.S. v. Apple Inc.*, 952 F. Supp. 2d 638, 690 (S.D.N.Y. July 10, 2013) ("Plus factors commonly considered by courts include a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, . . . evidence of a high level of interfirm communications.") (quotation and citations omitted).

of practices that are against ARX shops' own economic interest. *See Quality Auto Painting*, 917 F.3d at 1261-62, 1269 (to be a plus factor, the parallel conduct must be contrary to the conspirators' self-interest) (referencing *Twombly,* 550 U.S. at 553-54, and *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 570-71 (11th Cir. 1998)).   Rather, it alleges ARX shops engage in conduct to increase the likelihood that GEICO will recommend their shops to GEICO insureds and claimants – hardly allegations that are not in the ARX shops' best interest.  Compl. ¶ 9.  Leif's does not even allege anticompetitive conduct; it alleges ARX shops charge reduced repair prices. Compl. ¶ 11.  Leif's does not contend ARX shops have ever communicated or exchanged information regarding pricing or tactics, or have ever interacted at all.[4]  Instead, Leif's conclusorily alleges that "GEICO reports to each ARX partner how others are performing in comparison." Compl. ¶ 11.  Leif's allegation effectively asserts that the ARX shops are "following the example set by a competitor, [which] without agreeing to do so in advance, is textbook 'price leadership'- a practice [that] is insufficient to establish the existence of an agreement." *Quality Auto Painting*, 917 F.3d at 1264.[5]

Without direct allegations of a horizontal conspiracy among the ARX shops and without plus factors, Leif's price-fixing claim fails as a matter of law. *In re Musical Instruments & Equip.*

---

[4] *See Apple*, 952 F. Supp. 2d at 693 ("The evidence of this conspiracy can be found . . . in the web of telephone calls among Publisher Defendants' CEOs surrounding each turning point in the presentation and execution of the Agreements.").

[5] Leif's allegations differ strikingly from *In re Disposable Contact Lens*.  There, the plaintiffs alleged the defendant-manufacturers conspired with the distributor and others to establish a minimum sales price to prevent discount retailers from discounting contact lens prices, the court analyzed whether the plaintiffs alleged "plus factors" to support an allegation that the defendants entered into horizontal agreements.  215 F.Supp.3d 1272.  The defendants represented 90% of the United States contact lenses market, the plaintiffs alleged plus factors that: (1) the defendants engaged in pricing changes during a short period of time ("primarily within six months"); (2) the pricing scheme was "unprecedented in the contact lens industry, and represented a fundamental shift in the price model;" and (3) that the pricing was "contrary to the Manufacturer Defendants' economic self-interest, if not adopted in tandem."  *Id*. at 1279, 1296.

*Antitrust Litig.*, 798 F.3d at 1186, 1192 n. 3 (with no third element – horizontal agreements among the spokes – a hub-and-spoke conspiracy is "rimless" and "is not a hub-and-spoke conspiracy at all (for what is a wheel without a rim?); it is a collection of purely vertical agreements").

## II.   THE BOYCOTT CLAIMS (SECOND AND THIRD CLAIMS) FAIL BECAUSE LEIF'S FAILS TO ALLEGE THAT GEICO OR THE ARX SHOPS, INDIVIDUALLY OR COLLECTIVELY, REFUSE TO DEAL WITH LEIF'S

The second and third claims assert that GEICO and the ARX shops agreed to boycott Leif's.  Compl. ¶ 33.  The second claim asserts this group boycott is a *per se* antitrust violation and the third claim asserts it violates the rule of reason.  Compl. ¶¶ 34, 43.  For the same reason Leif's allegations of a horizontal price-fixing conspiracy among ARX shops fails as a matter of law, its allegations of a horizontal group boycott among ARX shops fails too.[6]

Both group boycott claims also fail because Leif's alleges no facts plausibly suggesting GEICO agreed with ARX shops to boycott Leif's.  Leif's also alleges no facts plausibly suggesting GEICO or any ARX shop has refused to deal with Leif's.  The third claim also fails because Leif's failed to allege facts plausibly supporting elements of its rule of reason claim.

### A.   No Agreement To Boycott Leif's Is Alleged

Although Leif's alleges GEICO agreed to refer policyholders to ARX shops for certain concessions on price, signage, space in the ARX shop, and inspection of books and records, Leif's

---

[6] The *per se* rule in the boycott context is further limited to cases involving "horizontal agreements among direct competitors."  *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998).  Even when horizontal agreements among direct competitors are alleged, the *per se* rule "would apply only if no 'pro-competitive justification' were to be found."  *Id.* (referencing *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959)); *see also Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 295-97 (1985).  In *Nw. Wholesale Stationers*, the rule of reason, not the *per se* rule, applied to a group of office supply retailers where the arrangement at issue "permits the participating retailers to achieve economies of scale . . ., ensures ready access to a stock of goods . . . [and t]he cost savings enable. . . reduce prices . . ."  472 U.S. at 295.  The same is true of GEICO's alleged agreements with ARX shops – the volume permits economies of scale, GEICO has ready access to repair services for its customers and prices are reduced in exchange for volume.

did not allege GEICO agreed with any ARX shop to boycott Leif's.  Compl. ¶¶ 7-11.[7]  Simply agreeing to a referral arrangement is not a boycott.  *Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660 F.2d 1195, 1203 (7th Cir. 1981) ("A [referral] contract . . . between a buyer (the insurance company) and a seller (the body shop) generally does not, without more, appear to violate the antitrust laws at all.  Only if such an agreement contains restrictions on one party's activities other than those involved in the immediate purchase and sale does the possibility of a Sherman Act violation arise.").

It is perfectly rational for GEICO to try to obtain consistency in quality, increased attention and customer service to GEICO customers and, as alleged, lower prices; and for ARX shops to work with GEICO to get a steady stream of work.  It is also sensible for GEICO to refer its insureds and claimants to the ARX shops providing higher quality services at lower prices.  Other than accepting referrals and agreeing to the other alleged terms unrelated to boycotting it, Leif's alleges nothing about how ARX shops participated in a boycott of Leif's.  All Leif's alleges is that GEICO prefers to do business with body shops other than Leif's – a proposition that is rational for several reasons, including that GEICO believes other shops will perform better services than Leif's and other shops do not harass or threaten GEICO employees with physical harm.  *See Gov't Emp. Ins. Co. v. Leif's Auto Collision Ctrs.*, 3:17-cv-00045-PK, Doc. 1 (D. Or. Jan. 10, 2017) (detailing Leif's and its employees' physical threats of harm and harassment of GEICO's employees).

**B.**     **The Second and Third Claims Fail Because Leif's Alleges No Facts Plausibly Suggesting GEICO Refused To Deal With Leif's**

The boycott claims also fail because Leif's alleges no facts plausibly suggesting GEICO unilaterally refused to deal with Leif's, or even that GEICO refused to permit any policyholder to

---

[7] *See supra* footnote 1.

obtain services from Leif's.[8]   Quite the opposite, Leif's alleges that, despite not being an ARX shop, Leif's "has done business at various times . . . with GEICO's policyholders," "[m]ost of its business comes from customers for whom insurance providers such as GEICO are responsible for paying repair costs," and the services it has provided to GEICO's policyholders are not "the quality of services it believes GEICO policyholders deserve and that manufacturers require."  Compl. ¶¶ 15, 29.  Rather than refusing to deal with Leif's, GEICO deals with Leif's but allegedly will not reimburse for higher labor rates or for certain procedures.  Compl. ¶¶ 13-14.[9]   Rather than a boycott, Leif's alleges it faces a "choice of sacrificing quality in repairs for GEICO policyholders." Compl. ¶ 21.   If Leif's is not performing work for GEICO policyholders, or is performing substandard work (as it alleges), it is not a boycott under 11th Circuit precedent.  *See Quality Auto Painting*, 917 F.3d at 1271-72.[10]

Leif's real complaint appears to be that GEICO chooses to not refer the volume of business to which Leif's feels it is entitled relative to its competitors, which Leif's alleges GEICO believes provide better quality services at lower prices.  Compl. ¶¶ 20, 35 (alleging Leif's is "den[ied] access to GEICO's guaranteed referrals," "to policyholders, a system of referrals, and other

---

[8] The Complaint refers to ARX shops as participants in the alleged boycott, but does not allege the ARX shops, competitors of Leif's, purchase services from Leif's or direct anyone else not to do so.  The argument that ARX shops "boycotted" Leif's by not referring customers to a competitor is incoherent.  GEICO alone boycotting Leif's (which was not alleged), is not a group boycott. *See Klor's,* 359 U.S. at 212 (single trader refusal to deal is not a group boycott).

[9] Although the allegation about scans is accepted as true for purposes of this motion, it is also manifestly false.

[10] The Eleventh Circuit rejected a similar group boycott claim by body shops against insurers, finding that "even if there were considerable uniformity with respect to those reasons that an insured should not use a particular shop, there could hardly be reasons more expected or more commonly used than . . . [t]hat the shop is not on the preferred provider list, that there are quality issues, that it charges more, and/or that it takes longer[-]reasons that any company would be expected to use to persuade an insured not to use a particular shop.  The alleged boycotting methods are not so idiosyncratic that they suggest conspiracy."  *Id.* at 1272.

resources necessary to compete in the market for repairs to GEICO policyholders' cars").  "It is well established that a merchant, whether he be a manufacturer, distributor, wholesaler, or retailer, may choose with whom he will do business . . . [and] such action generally does not violate the antitrust laws."  *Constr. Aggregate Transp., Inc. v. Fla. Rock Indus., Inc.* 710 F.2d 752, 772 (11th Cir. 1983); *see also Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984) ("A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently."); *Crawford's Auto Ctr., Inc. v. State Farm Mutual Auto. Ins. Co.*, 945 F.3d 1150, 1159-60 (11th Cir. 2019) (albeit in the RICO extortion context, a service provider's fear of economic loss does not mean GEICO's decision not to use that provider is wrongful).  GEICO's alleged unilateral decision not to enter an ARX agreement with Leif's, or to refer Leif's a greater volume of customers, is not proscribed by the Sherman Act or any other law.

### C.    <u>Leif's Does Not Allege The Elements Of A Rule Of Reason Claim</u>

The second boycott claim (Compl. ¶¶ 42-46), also fails because Leif's failed to allege facts plausibly suggesting elements required by the rule of reason.  For a rule of reason claim, Leif's had to allege facts plausibly suggesting:

(1)    A product or service market that is relevant for antitrust purposes;

(2)    A geographic market that is relevant for antitrust purposes;

(3)    Market power in the relevant product/service and geographic markets;

(4)    Barriers to entry;

(5)    Wrongful conduct resulting in anticompetitive effect (*i.e.*, conduct that raises prices above competitive levels, suppresses payments below competitive levels, or suppresses output below competitive levels);

(6)    The anticompetitive effects outweigh the pro-competitive benefits;

(7)    The antitrust claimant suffered an antitrust injury, causing it to have antitrust standing;

(8)     The antitrust claimant suffered damages.

*See, e.g.*, *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012); *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008); *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1071 (11th Cir. 2004); *Image Technical Servs., Inc. v. Eastman Kodak, Co*., 125 F.3d 1195, 1202 (9th Cir. 1997) ("*Kodak*"); *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1552-55 (11th Cir. 1996).

### 1.     *Leif's Does Not Plead A Relevant Product Or Service Market*

Leif's had to allege a cognizable product or service market that encompasses all economic substitutes for a product or service.  *See, e.g., Polypore Int'l., Inc. v. F.T.C.*, 686 F.3d 1208, 1217 (11th Cir. 2012) ("Defining a relevant product market is primarily a process of describing those groups of producers which, because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other.").  "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe v. U.S.*, 370 U.S. 294, 325 (1962).  A product or service market that is relevant for antitrust purposes amounts to the "commodities reasonably interchangeable by consumers for the same purposes . . ., monopolization of which may be illegal." *Moecker v. Honeywell Int'l, Inc*, 144 F. Supp. 2d 1291, 1303 (M.D. Fla. Apr. 4, 2001) (quoting *U.S. v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)).  "To define a relevant market is to identify producers that provide customers of a defendant firm (or firms) with alternative sources for the defendant's product or services." *Levine*, 72 F.3d at 1552 (quoting 2A Areeda et al. ¶ 530a at 150); *see also U.S. v. Rockford Mem'l Corp.*, 717 F. Supp. 1251, 1261 (N.D. Ill. 1989) ("The geographic 'market [should be in an] area in which the seller operates, and to which the purchaser can practicably turn for supplies.'") (citing *U.S. v. Phila. Nat'l Bank*, 374 U.S. 321, 359 (1963)); *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d

986, 995 (11th Cir. 1993) ( "a relevant product market is primarily a process of describing those groups of producers which, because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other").

The Complaint purports to define the relevant service market as "the market for collision repairs to GEICO policyholders' cars," claiming that "[o]nce a policyholder has an accident, the policyholder is locked into its insurer for coverage."  Compl. ¶ 17.  This is not a service market because it conflates a voluntary contractual limitation with a service market.

A product market cannot be defined by contractual rights "knowingly and voluntarily" given to a defendant.  *See Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1222 (11th Cir. 2002) (distinguishing between "contract power and market power," and holding that a defendant having "considerable power over many aspects of [an industry participant's] business by virtue of the provisions of the contract to which they agreed reveals little about the issue of whether [the defendant] had market power in the broader, relevant market").  "[C]ontracts always restrain and affect a party's available choices, but [] for purposes of determining a relevant product market, a court looks not to contractual restraints on a particular consumer, but rather to the uses to which the product is put by consumers in general and whether there are interchangeable substitutes." *Id*. at 1221-22 (quoting and adopting *Queen City Pizza, Inc. v. Domino's Pizza, Inc*., 124 F.3d 430-40 (3rd Cir. 1997) (rejecting market of franchisees that voluntarily contracted with franchisor)). The Complaint does not allege GEICO policyholders did not know they were locked into GEICO coverage after a covered automobile accident, nor could it.  Leif's cannot state a claim based on the contractually-created market for collision repairs to GEICO policyholders' cars.

Leif's, perhaps recognizing a purported GEICO-only relevant market fails to state a claim under the rule of reason as a matter of law, claims an alternative (and equally implausible) relevant

service market is the market for servicing automobile collision repairs.  Compl. ¶ 17.  GEICO, the only defendant, is not in the automobile collision repair business.  Compl. ¶ 6 ("GEICO sells car insurance . . . .").  GEICO is not a competitor in this alternative purported relevant market or a seller or producer who could deprive other sellers or producers of business.

### 2.      *Leif's Does Not Plead A Relevant Geographic Market*

An antitrust claim must allege plausible facts tending to prove a relevant geographic market.  *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010).  A relevant geographic market is the geographic area of effective competition, including firms that would enter if a price increase occurs.  *See, e.g.*, *Standard Oil Co. of Cal. and Standard Stations, Inc. v. U.S.*, 337 U.S. 293, 299 n.5 (1949).  Relying on an arbitrary state line or company marketing area is insufficient as a matter of law.  *See Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 626-27 (5th Cir. 2002) ("the economic significance of a geographic area does not depend upon singular elements such as population, income, ***political boundaries***, or geographic extent, but rather upon the relationship between these elements and the characteristics of competition in the relevant product market within a particular area") (emphasis added).  Establishing a relevant geographic market is entirely Leif's' burden, and Leif's alleges no facts that establish a relevant geographic market or exclude other markets.  *See*, *e.g., id.* at 630-33 (affirming dismissal for failure to plead a plausible relevant geographic market); *Spanish Broad. Sys. of Fla.*, 376 F.3d at 1071-72.

Leif's asserted "[t]he relevant geographic market is the Portland, Oregon metropolitan statistical area [("Portland MSA")], because in almost all circumstances collision repairs are performed close to where the owner lives."  Compl. ¶ 17.  Leif's, however, alleges no facts tending to prove that the Portland MSA is a properly defined relevant geographic market and a simple

Google search indicates there is not a "Portland, Oregon" metropolitan statistical area.[11]

### 3.    *Leif's Does Not Allege GEICO Possesses Market Power*

Assuming Leif's had alleged a plausible relevant product and geographic market, which it has not, Leif's had to allege GEICO "possessed power" in the relevant market.  *Maris Distrib.*, 302 F.3d at 1213;[12] *Retina Assocs., P.A. v. S. Baptist Hosp. of Fla., Inc.*, 105 F.3d. 1376, 1383 (11th Cir. 1997) ("to successfully show potential anticompetitive effects, the Plaintiff must first define the relevant geographic and product markets and then prove that the Defendants possessed power in that market") (citation omitted).[13]

Leif's alleges no facts describing the source, extent or limits of GEICO's purported market power.  Compl. ¶ 18.  Leif's conclusory market power allegation appears to be intended to apply whether the relevant market is GEICO's policyholders or all automobile collision repairs in the Portland MSA.  Had Leif's alleged any facts supporting its market power conclusion, it would be clear that GEICO could not exert market power in the automobile collision repair market.  According to the Oregon Division of Financial Regulation, GEICO's market share in the Oregon private passenger auto insurance industry was only 0.31% in 2018.  *See* Ex. 5 to GEICO's concurrently filed Req. for Judicial Notice.  It is inconceivable that GEICO could translate such

---

[11]      *See*      https://www.bls.gov/bls/omb-bulletin-15-01-revised-delineations-of-metropolitan-statistical-areas.pdf (indicating Portland, Oregon is in a Portland-Vancouver-Hillsboro, OR-WA Metropolitan Statistical Area); https://en.wikipedia.org/wiki/Portland_metropolitan_area (same).

[12] "In order to prove an anticompetitive effect on the market, the plaintiff may either prove that the defendants' behavior had an 'actual detrimental effect' on competition, or that the behavior had 'the potential for genuine adverse effects on competition.' In order to prove the latter, the plaintiff must define the relevant market and establish that the defendants possessed power in that market." *Levine*, 72 F.3d at 1551 (citation omitted).

[13] Without market power, a group boycott would have no anticompetitive effect. *See, e.g., Nw. Wholesale Stationers*, 472 U.S. at 296.

low market share in the auto insurance industry into the market power Leif's conclusorily alleges it has in the automobile collision repair market.

### 4. *Leif's Does Not Allege Barriers To Entry*

Leif's also failed to allege barriers to entry. *See e.g., McGahee v. N. Propane Gas Co.*, 858 F.2d 1487, 1501 (11th Cir. 1988) ("other factors, such as the defendant's market share capacity and the barriers to entry after competitors have been driven from the market, must also be considered, because these factors indicate whether an illegal predator is capable of successfully pursuing a predatory scheme") (citation omitted); *Levine*, 72 F.3d at 1551, 1555; *Moecker*, 144 F. Supp. 2d at 1308; *Nat'l Bancard Corp. v. VISA U.S.A. Inc.*, 596 F.Supp. 1231, 1259 (S.D. Fla. Sept. 20, 1984) (market power/barriers to entry relevant to Section 1 conspiracy claim); *Reazin v. Blue Cross and Blue Shield of Kan., Inc.*, 899 F.2d 951, 968 (10th Cir. 1990) (barriers to entry relevant to Section 1 conspiracy claim market power analysis)  Even a 100% monopolist has no market power absent barriers to entry. *Kodak*, 125 F.3d at 1208.

A barrier to entry is any market feature capable of constraining the normal operation of a relevant market if the relevant market is unlikely to be self-correcting over time. *Id.*  But, if the purported barrier to entry does not prevent self-correction over time, then the antitrust claim fails. *Id.*  To establish barriers to entry, Leif's had to also show that new competitors (or existing competitors with excess capacity) seeking to enter the relevant market face high market barriers to entry, but Leif's did not so allege. *See, e.g., Kodak*, id*. at 1207-08;  *Lockheed Martin Corp. v. Boeing Co.*, 390 F.Supp.2d 1073, 1078, 1079, n.6 (M.D. Fla. Feb. 15, 2005).  Leif's failure to allege barriers to entry requires dismissal.

### 5. *Leif's Does Not Allege The Purported Restraint Had Anticompetitive Effects And The Anticompetitive Effects Outweigh The Procompetitive Benefits*

Leif's failed to allege how the purported conduct (*i.e.*, referring customers to a lower-priced

competitor which performs higher quality services than Leif's admittedly performs) might be anticompetitive.  *See, e.g.*, *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985) (plaintiff must prove anticompetitive effects in the relevant market); *Levine*, 72 F.3d at 1551 ("Rule of reason analysis requires the plaintiff to prove [ ] an anticompetitive effect of the defendant's conduct on the relevant market . . . .").  Leif's cannot meet the anticompetitive effects element by simply alleging a restraint, particularly when that restraint is merely lower prices.  Instead, Leif's had to allege how this purported restraint is anticompetitive.  Low prices rarely raise antitrust concerns but, instead, are precisely what the antitrust laws are designed to promote.  *See, e.g.*, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986).  Low prices typically indicate competition, not the lack of it.  *See, e.g.*, *id.*  In *Nw. Wholesale Stationers*, the Supreme Court held that a group boycott "does not necessarily imply anticompetitive animus and thereby raise a probability of anticompetitive effect."  472 U.S. at 296.  Courts closely scrutinize group boycott allegations for the adequacy of anticompetitive effects allegations, even when there is "no legitimate business reason for that purchasing decision."  *NYNEX Corp.*, 525 U.S. at 135.  The Complaint alleges a strong procompetitive benefit – lower prices – and that the purpose of the alleged boycott was to ensure these lower prices.  Leif's alleges no cognizable anticompetitive effects whatsoever.  *See Nw. Wholesale Stationers*, id. at 296.

## III.   LEIF'S' ANTITRUST CLAIMS (FIRST, SECOND AND THIRD CLAIMS) FAIL BECAUSE LEIF'S ALLEGES NO ANTITRUST INJURY

Leif's had to demonstrate antitrust injury for its *per se* and its rule of reason Sherman Act claims.  *Delong Equip. Co. v. Wash. Mills Electro Minerals Corp.*, 990 F.2d 1186 (11th Cir. 1993).  Because antitrust laws protect competition, not competitors, many injuries – including direct injuries – suffered by plaintiffs are not cognizable under the antitrust laws.  *See, e.g.*,  *Tucci v. Smoothie King Franchises, Inc.*, 215 F.Supp.2d 1295, 1299-300 (M.D. Fla. July 3, 2002) ("The

purpose of the Sherman Antitrust Act is to protect competition, not individual competitors."). Leif's Complaint had to allege facts demonstrating the existence of antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atl. Richfield Co. v. USA Petroleum, Inc.*, 495 U.S. 328, 334 (1990)) (quotations and citations omitted). Even injury "casually related to an antitrust violation" "will not qualify as 'antitrust injury' unless it is attributable to an anti-competitive aspect of the practice under scrutiny, since it is inimical to the antitrust laws to award damages' for losses stemming from continued competition." *Id.* (quotations and citations omitted).

The Complaint described harm outside the ambit of the antitrust laws.  Leif's complains it received less business than its competitors because of the ARX program (Compl. ¶ 38), but lost revenue from competition is not an antitrust injury.  *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (lost profits due to more efficient competitors are not an injury to be redressed by the antitrust laws).

Without pointing to a single example, Leif's conclusorily asserts that GEICO's conduct results in "[c]heaper, faster, lower quality repairs," but does not explain why this is an antitrust injury.  Compl.  ¶ 27.  Cheaper and faster – or lower-priced and more efficient – flow from competition, not anticompetitive effects or conduct.  *Khan*, 522 U.S. at 15 (quoting *Matsushita Elec*, 475 U.S. at 594) ("[C]ondemnation of practices resulting in lower prices to consumers is 'especially costly' because 'cutting prices in order to increase business often is the very essence of competition.'").  The Supreme Court, in addressing similar vertical conduct, noted the obvious procompetitive benefits of similar price agreements because of the inability of an actor like GEICO to run its suppliers out of business.  *Id.* at 15-16 ("As for maximum resale price fixing, unless the

-16-

supplier is a monopsonist he cannot squeeze his dealers' margins below a competitive level; the attempt to do so would just drive the dealers into the arms of a competing supplier.").

As to quality, all Leif's alleges is that, to compete with ARX shops on price, Leif's provided lower quality services. Compl. ¶ 2 (Leif's has "to choose between performing shoddy repair work for GEICO's policyholders or receiving no referrals and only partial reimbursement from GEICO"); *id.* ¶ 21 ("GEICO is forcing Leif's into an unacceptable choice of sacrificing quality in repairs for GEICO policyholders or not servicing GEICO customers"); *id.* ¶ 29 (alleging Leif's provided services to GEICO policyholders that are not the quality they "deserve" or consistent with what "manufacturers require"). Leif's alleges no facts about general quality in the market or that any ARX shop provided lower quality repairs at any point in time, and the Court should not accept as true unsupported conclusions and unwarranted inferences. *See e.g. Quality Auto Painting*, 917 F.3d at 1266 (allegations with no basis "are merely conclusions and therefore are an insufficient basis" to support an inference).

Leif's also conclusorily alleges that "GEICO's practices makes [sic] it more burdensome for policyholders to obtain information needed to evaluate and choose the type of collision repair services they would like to receive." Compl. ¶ 44. This is projecting. Leif's seeks to muzzle GEICO; there are no allegations that GEICO attempts to muzzle Leif's.

## IV.   LEIF'S DID NOT STATE A CLAIM FOR INTENTIONAL INTERFERENCE WITH ECONOMIC RELATIONS (FOURTH CLAIM)

To state a claim for intentional interference with economic relations under Oregon Law, Leif's had to allege: "(1) the existence of a professional or business relationship (which could include, e.g., a contract or a prospective economic advantage), (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and

(6) damages." *McGanty v. Staudenraus*, 901 P.2d 841, 844 (Or. 1995) (citations omitted).  This claim fails because Leif's does not allege facts plausibly supporting almost any element of this claim and does not meet the Federal Rule of Civil Procedure 9(b) particularity requirement.

Leif's does not allege a business relationship "that would have *very likely* resulted in a pecuniary benefit" to Leif's but for GEICO's interference.  *Fox v. Country Mut. Ins. Co.*, 7 P.3d 677, 690 (Or. Ct. App. 2000) (emphasis added); *see also Evans v. Sirius Computer Solutions, Inc.*, No. 3:12-CV-46-AA, 2012 WL 1557294, at *3 (D. Or. May 1, 2012) (dismissed because no business relationship with potential customers alleged); *FLIR Sys., Inc. v, Sierra Media, Inc.*, No. CV-10-971-HU, 2011 WL 1832806, at *7 (D. Or. May 10, 2011) (the possibility that a person might buy a product is not enough to create a business relationship).  The Complaint alleges no potential or actual relationship that was "very likely" to result in a benefit to Leif's, it merely asserts that, but for unspecified statements, an unidentified car owner may have considered using Leif's at some point.  Compl. ¶¶ 49-50 (alleging generally that GEICO made statements that discouraged "policyholders" from choosing Leif's).

Leif's also does not allege GEICO's actions were wrongful.  Under Oregon law, any alleged interference must be wrongful by some measure independent of the interference itself.  *Nw. Natural Gas Co. v. Chase Gardens, Inc*., 982 P.2d 1117, 1124 (Or. 1999).  Leif's had to allege GEICO interfered for an improper purpose, rather than a legitimate one, or used improper means. *Uptown Heights Assoc. Ltd. P'ship v. Seafirst Corp.*, 891 P.2d 639, 646 (1995); *Glubka v. Long*, 837 P.2d 553, 554-55 (Or. Ct. App. 1992).  The conclusory allegation that GEICO's actions and purpose were improper is inadequate.  *See* Compl. ¶ 51.  Leif's alleges no basis to assume GEICO had an improper purpose in directing its customers to lower-priced collision repair facilities.  Nor does Leif's allege a basis to assume GEICO's communications were an improper means of

ensuring its customers had information about the costs of repairs.   Oregon law specifically contemplates that insurance companies will recommend repair shops.  *See* Or. Rev. Stat. § 746.280 (case modified) (discussing an insured's rights when an insurer recommends a repair shop). Permissive communications to aid consumers—particularly when expressly acknowledged by the Oregon legislature—cannot be wrongful under Oregon law.

GEICO is also not a stranger to the alleged relationship between Leif's and its hypothetical customers.  *See Wieber v. FedEx Ground Package Sys.*, *Inc*., 220 P.3d 68, 76-77 (2009) (rejecting intentional interference claim because "plaintiffs' relationship with those customers was inextricably linked to plaintiffs' contractual relationship with [defendant]").   GEICO is inextricably linked to any GEICO policyholder or claimant using an auto repair shop, including Leif's, for repairs covered under the policyholder's GEICO insurance policy.  GEICO's purported communications were directed to its policyholders and claimants pursuant to the terms of an insurance policy it issued to its insureds and fulfilling its obligations to them.  Comp. ¶ 49.  Leif's has no right of unfettered access to GEICO's policyholders and claimants, nor can Leif's restrict GEICO's ability to communicate with its policyholders.

The claim here, which is based on alleged misrepresentations, also had to be pled with Rule 9(b) particularity because it sounds in fraud.  *See Cordell Consultant, Inc. Money Purchase Plan & Trust v. Abbott*, 561 Fed. App'x. 882, 884 (11th Cir. 2014) (citing *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1064–65 (11th Cir. 2007)) (Rule 9(b) applies to claims that "sound in fraud"); *Borsellino and I.M. Acquisitions, LLC v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (Rule 9(b) applies to a tortious interference claim based on alleged fraudulent conduct); *N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 14 (1st Cir. 2009) (Rule 9(b) applies "given that fraudulent misrepresentation is the lynchpin"); *Vess v. Ciba-*

*Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003) ("Fraud can be averred by specifically alleging fraud, or by alleging facts that necessarily constitute fraud (even if the word 'fraud' is not used."). "Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Vess*, 317 F.3d at 1106 (citation omitted). The Complaint does not describe the "who, what, when, where, and how" of any statement that allegedly interfered with a prospective relationship.

Even had Leif's adequately alleged the nature of GEICO's purportedly "inaccurate representations" under Rules 8 or 9(b), alleged statements about Leif's quality and conduct are true as a matter of law. The public information available informed GEICO about Leif's' terrible quality. The Better Business Bureau gave Leif's has an "F" rating, the lowest rating it gives. GEICO's Req. for Judicial Notice, Ex. 1, Better Business Bureau Site Printout.[14]  Dozens of complaints about Leif's business practices have been filed with the Oregon Department of Justice, nineteen of which accuse Leif's of "[a]cting unconscionably," and nineteen of which accuse Leif's of failing to properly install goods or providing service quality lower than what was ordered or expected. *Id.* at Ex. 2, Oregon Department of Justice Consumer Complaints Printout. Yelp.com shows two facilities identified as "Leif's Auto Collision Repair" have an average rating of 1.75 stars out of 5. *Id.* at Exs. 3, 4, Yelp.com Reviews for Leif's Auto Collision Repair.

## V.   THE FIRST AMENDMENT PROHIBITS THE BOYCOTT AND INTENTIONAL INTERFERENCE CLAIMS (SECOND, THIRD AND FOURTH CLAIMS)

The alleged conduct on which the boycott and interference claims are based – using signage to represent an affiliation and providing an opinion, with which Leif's disagrees, about the quality of repairs a customer would get from Leif's and from ARX shops – is speech protected by the First

---

[14] Exhibits 1 through 4 are attached to GEICO's Request for Judicial Notice filed herewith. These exhibits are relevant because Leif's has the burden to allege that statements GEICO allegedly made are misleading or related to unlawful activity, which Leif's has not done.

Amendment that cannot support the claims. *See* Compl. ¶¶ 34, 49-50 (alleging conduct); *see also*, *e.g. Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 57 (1988) (intentional infliction of emotional distress claim "cannot, consistently with the First Amendment, form a basis for the award of damages"); *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 168 (5th Cir. 2007) (statute prohibiting communications about tied repair facilities is unconstitutional under the First Amendment).

The First Amendment protects GEICO's right to inform its policyholders based on the extensive public information demonstrating Leif's reputation for poor customer service and inadequate repairs. *See Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 778 (1986) ("To provide 'breathing space,' for true speech on matters of public concern, the Court has been willing to insulate even demonstrably false speech from liability, and has imposed additional requirements of fault upon the plaintiff in a suit for defamation."); *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 342 (2010) (corporations, like individuals, are protected by the First Amendment).

In *Abbott*, the Fifth Circuit held that a statute that prevented insurers from recommending a tied body shop to its customers unconstitutional. 495 F.3d at 167. Instead of furthering a legitimate state objective, the statute reduced the information available to consumers while failing to bolster competition. *Id.* The court found allegations that the tied shops would perform shoddy work unpersuasive: "[i]f the work performed on customer vehicles at a tied body shop is shoddy, aggrieved customers are free to pursue legal and administrative remedies." *Id.* The court also found numerous less restrictive means to further the ends of the statute existed. *Id.* at 168. Preventing GEICO from recommending repair shops that provide lower rates, and better and more services, or informing its customers about Leif's would only injure consumers.

## VI.   <u>CONCLUSION</u>

This is the second time Leif's has filed antitrust and tortious interference claims against GEICO. *Leif's Auto Collision Ctrs., LLC v. State Farm Mut. Auto. Ins. Co. of Or.*, 6:14-CV-

06014, Doc. 1 (M.D. Fla. Nov. 7, 2014).  Leif's first such complaint was dismissed.  *Id.* at Doc. 149.  In that light, and because at its core Leif's complains that it loses business to body shops that provide better quality at lower prices, this antitrust and tortious interference Complaint should be dismissed with prejudice.

DATED this 7th day of August, 2020.

Respectfully Submitted,

BY:   *s/ Dan W. Goldfine*

**Dan W. Goldfine**
E-mail: dan.goldfine@huschblackwell.com
**Ian M. Fischer**
E-mail: ian.fischer@huschblackwell.com
**HUSCH BLACKWELL LLP**
2415 E. Camelback Road, Suite 420
Phoenix, AZ  85016
Telephone: 480.824.7885
Facsimile: 480.824.7905

Attorneys for Defendant Government Employees
Insurance Company

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 7th day of August, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record that are registered with the Court's CM/ECF system.

*/s/ Dan W. Goldfine*